2009 WY 121

**Alan Arthur SANDOVAL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–09–0023.**

Supreme Court of Wyoming.

Oct. 6, 2009.

Representing Appellant: Diane Lozano, State Public Defender, PDP; Tina Kerin, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel.

Representing Appellee: Bruce A Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Alan Sandoval pled guilty to second degree murder in the beating death of his girlfriend's one year old daughter. After the district court sentenced him to serve seventy years to life in prison, he appealed. Mr. Sandoval argues that he was denied a fair sentencing when the prosecutor argued facts outside the record at the sentencing hearing

and the district court failed to provide him a full right of allocution. We conclude that the vast majority of the prosecutor's statements were appropriate and the one inappropriate statement did not prejudice Mr. Sandoval. Additionally, he was afforded a sufficient opportunity of allocution.

[¶ 2] We affirm.

## ISSUE

[¶ 3] Mr. Sandoval presents a general issue on appeal:

I. Was Mr. Sandoval's right to a fair sentencing violated?

The State's statement of the issue is similar.

## FACTS

[¶ 4] On April 17, 2008, Mr. Sandoval killed his girlfriend's one year old daughter, AM. He confessed the homicide to law enforcement officers and his confession was recounted in the affidavit of probable cause that accompanied the felony information charging him with second degree murder.[1] Although Mr. Sandoval initially pleaded not guilty to the charge, he later changed his plea to guilty. His guilty plea was "cold," meaning it was not made pursuant to any agreement with the State. At his change of plea hearing, Mr. Sandoval recounted the events of April 17th and the district court incorporated the probable cause affidavit into the factual basis for the plea.

[¶ 5] At the sentencing hearing, defense counsel argued that Mr. Sandoval had killed the child in a short outburst of anger and he had taken responsibility for his crime by pleading guilty. He also made an impassioned plea for mercy, asking that Mr. Sandoval be sentenced to the minimum term of twenty years to life in prison. Mr. Sandoval gave a short statement apologizing for his actions and asking for leniency. The State advocated for a significantly more severe sentence of seventy years to life in prison. In support of its position, the State argued that the evidence demonstrated that Mr.

Sandoval's crime was brutal and prolonged and did not amount to a short fit of rage. At the conclusion of the hearing, the district court accepted the State's recommendation and sentenced Mr. Sandoval to serve seventy years to life in prison. He appealed.

## STANDARD OF REVIEW

[¶ 6] At his sentencing hearing, Mr. Sandoval did not object to the district court's sentencing procedures. Our review is, therefore, limited to a search for plain error. In order to establish plain error, the defendant must show that the record patently demonstrates the district court transgressed a clear and unequivocal rule of law and such violation adversely affected his substantial right. *Manes v. State*, 2004 WY 70, ¶ 9, 92 P.3d 289, 292 (Wyo.2004).

[¶ 7] Although our review is for plain error, we are also guided by other principles. Sentencing decisions rest within the broad discretion of the district court. *DeLoge v. State*, 2002 WY 155, ¶ 9, 55 P.3d 1233, 1237–38 (Wyo.2002). We will not reverse a sentencing decision "absent a showing by the defendant of an abuse of discretion, procedural conduct prejudicial to him, circumstances that manifest inherent unfairness and injustice, or conduct that offends the public sense of fair play." *Id.*

[¶ 8] Due process requires that the court consider only accurate information in imposing sentence. *Manes*, ¶ 9, 92 P.3d at 292. "[A] sentencing decision cannot be based upon unreliable information, undocumented information, or inaccurate information." *Hubbard v. State*, 2008 WY 12, ¶ 24, 175 P.3d 625, 630 (Wyo.2008). If a prosecutor brings undocumented or inaccurate allegations to the district court's attention during sentencing, he engages in misconduct. *Id.* Nevertheless, a showing that inaccurate information was presented to the court will not necessarily justify a reversal; "the defendant must demonstrate that the trial court relied upon the statements in sentencing to

---

1. Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2009) governs second degree murder:

    Whoever purposely and maliciously, but without premeditation, kills any human being

is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life.

prevail." *Manes*, ¶ 9, 92 P.3d at 292. *See also, Hubbard*, ¶ 19, 175 P.3d at 629.

## DISCUSSION

### 1. Prosecutorial Misconduct

[¶ 9] Mr. Sandoval claims that his right to a fair sentencing was violated when the prosecutor introduced facts at the sentencing hearing that were not documented in the record. He points to several different instances which he claims amount to prosecutorial misconduct.

[¶ 10] First, Mr. Sandoval contests the prosecutor's assertion that he joked with his father about the homicide. The prosecutor stated:

> Is there remorse? Does [Mr. Sandoval] feel bad? Maybe, but in a conversation he had with his father, Your Honor, his father told him, "Somebody saw you—somebody saw you on TV down in Denver. You're famous." They chuckled about it.

He claims that the "chuckling incident" was undocumented and the prosecutor should not have mentioned it at sentencing.

[¶ 11] Mr. Sandoval is apparently correct in his assertion that this conversation was not documented in the record. The prosecutor, therefore, committed misconduct by referring to it at sentencing. *See, DeLoge*, ¶ 13, 55 P.3d at 1239. However, in order to warrant reversal, Mr. Sandoval must demonstrate that he was prejudiced because the district court relied upon the improper information in passing sentence. He concedes that there is no indication that the improper statement influenced the judge's sentencing decision. As such, he has failed to show plain error justifying reversal of his sentence.

[¶ 12] Mr. Sandoval also challenges the prosecutor's statement that "Your Honor, we've given him a concession for his taking of responsibility in the form of a second-degree murder charge." He claims this statement was inaccurate because he was never charged with anything other than second degree murder, there was no plea agreement between him and the State and, consequently, no "concession" by the State.

[¶ 13] The prosecutor's statement about the charging concession was an understandable response to defense counsel's statement that it was appropriate that Mr. Sandoval faced second degree murder penalties rather than first degree murder penalties because he did not premeditate the murder.[2] Defense counsel also recognized, however, that even without premeditation the State could have charged Mr. Sandoval with felony murder, in which case Mr. Sandoval would have faced first degree murder penalties. With defense counsel's argument about the charge in mind, the prosecutor's statement that Mr. Sandoval had already received a concession in the form of a second degree murder charge makes sense and was accurate. As such, Mr. Sandoval has failed to show that a clear and unequivocal rule of law was violated.

[¶ 14] Mr. Sandoval's third contention of prosecutorial misconduct pertains to the prosecutor's recitation of the details of the crime and the child's injuries. He claims that the prosecutor's description of the episode resulting in the child's death indicated it was far more prolonged and extensive than described in the factual basis at his change of plea hearing. For example, Mr. Sandoval pointed to the following statement by the prosecutor as being improper:

> Your Honor, this was not a brief moment of lapse in judgment, an instance of a loss

---

2. Wyo. Stat. Ann. § 6-2-101 (LexisNexis 2009) governs first degree murder:

(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, sexual abuse of a minor, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.

(b) A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of eighteen (18) years.

of control. This was a brutal attack on a helpless baby girl, an attack that from the physical evidence saw the defendant swinging this child around the room, throwing her around the room, slamming her into objects such as the crib with enough force to actually break the crib with her tiny little head.

He also contends that the prosecutor strayed from the evidence by describing the disarray in the child's room as evidence of Mr. Sandoval's prolonged fit of rage and stating that "[h]e beat this baby to death and beyond."

[¶ 15] Mr. Sandoval claims that it is clear the district court relied on the prosecutor's statements. In his reasons for imposing the lengthy sentence, the judge stated:

[M]ost troubling is, I think, the continuing nature of the rage after this child was already, I think, pretty clearly unconscious and badly injured, apparently, the beating and throwing about continued.... This really is not an incident—a momentary outburst of anger. This apparently went on over some nightmarish period of time in which the baby was thrown about. The apparent breaking of the crib rail by striking the baby against it is breath taking.

The district court stated that such facts justified imposing a more severe sentence.

[¶ 16] Of course, no one but Mr. Sandoval knows what actually happened during the episode that led to the child's death. At his change of plea hearing, he stated:

I continued to drink the Jack Daniels, and at one point in time, the baby was crying, and I became frustrated with her. So I grabbed her on the leg and squeezed it.

[Defense Counsel]: Did that help?

The Defendant: No. She continued to cry, and I got frustrated with her and intended to remove her away from me so I could calm down, and upon doing so, I tossed her down onto her bedroom floor.

[Defense Counsel]: Do you believe that's when she hit her head?

The Defendant: Yes, I believe that's when she hit her head.

[Defense Counsel]: You believe that's when she suffered the injuries that caused her death?

The Defendant: Yes, I believe that's when she suffered her injuries, and I rolled her around a couple of times back and forth, and noticed there was some blood in her mouth. I believe she had bit her tongue, and so I wiped that off, and returned to the living room, and after a couple of moments I went and grabbed the baby and checked on her, and she seemed kind of listless, wasn't crying or anything. So I picked her up, carried her into the living room, was holding her.

[Defense Counsel]: And the autopsy and information obtained by law enforcement of the case showed that the child died of injuries consistent with what Mr. Sandoval has told you here today.

The Court: So, Mr. Sandoval, your actually throwing the baby down on the floor killed her?

The Defendant: I believe so.

[¶ 17] The district court then asked whether the State had anything to add to the factual basis. The prosecutor asked that the unredacted version [3] of the affidavit of probable cause be incorporated into the factual basis. Mr. Sandoval confirmed the information in the affidavit which stated:

Detective Garrison asked Sandoval to go through his interaction with AM the day of 4/17. Sandoval confirmed that [the child's mother] was working and that she had come home for lunch and that AM was fine. [The mother] returned to her work. At approximately 2:30 p.m. Sandoval related that he was tired and had been drinking Jack Daniel's when AM began to cry. Sandoval indicated that he grabbed the upper part of AM's leg and squeezed, leaving a visible bruise. When AM would not quit crying Sandoval stated that he picked AM up and threw her onto the floor in AM's bedroom. Sandoval indicated that in his opinion this is when AM received the

---

**3.** The district court had ordered that the affidavit of probable cause be sealed from public inspection until the preliminary hearing because the investigation was ongoing. Thus, the non-confidential file contained only a redacted version of the affidavit.

fatal head injury. Sandoval went on to say that he then pushed AM around the room causing the lacerations to her head and facial area. At one point during this interview Sandoval made the statement "I killed my daughter." Sandoval further indicated that AM was bleeding so he cleaned some of the blood off of AM and took her to the couch because AM was not acting right. Sandoval related that AM began getting sleepy so he checked to make sure AM was breathing and returned AM to the crib in AM's room. Sandoval then went to sleep on the couch.

[¶ 18] On appeal, Mr. Sandoval contests the prosecutor's description of the attack and the child's injuries and argues that the prosecutor was not qualified to testify about the medical evidence. The autopsy report and photographs of the child and child's bedroom were admitted into evidence at the sentencing hearing without objection. Just the list summarizing the injuries to the child was more than a page long and included multiple injuries to her head and neck; chest, abdomen and pelvis; and extremities. The autopsy also noted that the child had older injuries that were in the process of healing at the time of her death. The photographs of the child's body revealed numerous injuries and massive skull fractures.

[¶ 19] The photographs of the child's room showed that the rail of the child's crib was broken and pieces of wood from the rail were resting on the mattress and pillow. Another photograph apparently depicted a wood chip in the child's hair. The photographs also revealed that the room was in a state of disorder. Mr. Sandoval claims that other interpretations of the evidence, besides the State's "tale of maniacal violence," were reasonable. For example, he states that the disarray in the child's room could be attributed to attempts to resuscitate the child. While Mr. Sandoval's interpretation of the evidence may be appropriate, the prosecutor's statements about the condition of the room and the child's injuries also amounted to a reasonable interpretation of the evidence.

[¶ 20] Mr. Sandoval's own statements confirm that the attack went on for a significant period of time. He stated that he squeezed the child's leg causing a visible bruise, then he threw her to the floor causing the fatal head injury, and finally he pushed her around the room causing additional lacerations to her head and facial area. The district court judge asked about the final set of injuries at the sentencing hearing:

As I read this presentence investigation report and the rest of the record ... I think on three occasions [there are references] to the fact that after Mr. Sandoval threw [the child] to the floor striking the back of her head on the floor, which apparently caused massive fractures to the skull, resulted in her death, it was after that that he said he pushed her around the floor thereby causing lacerations and perhaps contusions to her face. That seemed very unclear. Was he pushing her with his foot or pushing her in what manner?

[Defense Counsel]: With his hand, Your Honor.

The Court: Having a little bit of a hard time understanding how that fit into the picture. Was that still during the continuation of the apparent fit of rage or anger?

[Defense Counsel]: This would just be my interpretation. He admitted his—and I believe he—[what] caused the death was the throwing [the child] to the ground. I believe that was the event. I believe that was more than—well, I think it would just be suspicion on my part as to what role that played. What I do know, I don't believe that was the cause of death.

The Court: I think that's pretty clear. It just seems odd in the record. That sort of stands out.

[Defense Counsel]: My best guess is it's some sort of—I believe it would fall into the incomprehensible nature of what had happened, and his—I just don't know how a human being reacts after they've done something like this. I don't know if it was an effort to see if the child was all right or was going to be responsive. I don't necessarily believe it was done with the intention to cause more harm to the child. That's the best I can answer.

[¶ 21] The prosecutor described the brutal and prolonged nature of the attack to refute Mr. Sandoval's argument that he simply lost his temper for a short period of time and his claim that he should be afforded the same punishment as a defendant who had killed his child by shaking him. Most of the prosecutor's statements were derived directly from the undisputed autopsy and photographic evidence. There is nothing obviously inaccurate in his statements or which could not be inferred from the evidence. He simply argued his interpretation of the evidence; he did not submit inappropriate "medical testimony" as suggested by Mr. Sandoval on appeal.

[¶ 22] The record shows the district court paid particular attention to Mr. Sandoval's own statements about the crime. It also asked the defense if it had anything additional to offer after the prosecutor's presentation and description of his version of the attack. The defense declined the opportunity to contest the prosecutor's statements and chose, instead, to simply plead for mercy. Under these circumstances, the prosecutor's statements about the evidence and the nature of the attack did not amount to misconduct and, consequently, Mr. Sandoval has failed to show a violation of a clear and unequivocal error of law to establish plain error.

### 2. Right of Allocution

[¶ 23] Mr. Sandoval also claims that his right to a fair sentencing was violated because he was not afforded a full right of allocution. W.R.Cr.P. 32(c) governs sentencing and states in relevant part:

(c) *Sentence.*—

(1) Imposition.—Sentence shall be imposed without unnecessary delay, but the court may, when there is a factor important to the sentencing determination that is not then capable of being resolved, postpone the imposition of sentence for a reasonable time until the factor is capable of being resolved. Prior to the sentencing

hearing, the court shall provide the counsel for the defendant and the attorney for the state with a copy of the probation officer's report.... At the sentencing hearing, the court shall afford the counsel for the defendant and the attorney for the state an opportunity to comment upon the probation officer's report and on other matters relating to the appropriate sentence. Before imposing sentence, the court shall also:

(A) Determine that the defendant and defendant's counsel have had the opportunity to read and discuss the presentence investigation report made available pursuant to subdivision (a)(3)(A);

(B) Afford counsel for the defendant an opportunity to speak on behalf of the defendant; and

(C) Address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.

The attorney for the state shall have an equivalent opportunity to speak to the court. Upon a motion that is jointly filed by the defendant and by the attorney for the state, the court may hear *in camera* such a statement by the defendant, counsel for the defendant, or the attorney for the state.

[¶ 24] Rule 32(c) provides a criminal defendant the right to allocution, i.e., to make a statement on his own behalf.[4] *See, Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) (interpreting similar federal rule); *Christy v. State*, 731 P.2d 1204, 1207 (Wyo.1987). We have also recognized that a criminal defendant's right to allocution is protected by Wyo. Const. art. 1, § 10. *Christy*, 731 P.2d at 1207; *Harvey v. State*, 835 P.2d 1074, 1082 (Wyo.1992).

[¶ 25] Mr. Sandoval maintains that the district court violated his right of allocution by failing to personally address him to determine if he wanted to make a statement or had information to present in mitigation of

4. In the context of criminal sentencing, "allocution" means "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." Black's Law Dictionary (8th ed. 2004). *See also, Wilson v. State*, 2007 WY 55, ¶ 10, n. 1, 155 P.3d 1009, 1011, n. 1 (Wyo.2007).

sentence, as required by Rule 32(c). He claims that the court only said "good afternoon" and "thank you" to him and this did not satisfy its burden to personally address him. After Mr. Sandoval's family members and defense counsel made pleas for leniency on behalf of Mr. Sandoval, defense counsel broached the subject of Mr. Sandoval offering an allocution.

> [Defense Counsel]: Then, if appropriate, I'd like to have Mr. Sandoval make a brief statement.

> The Court: He certainly is welcome to do so. Good afternoon, Mr. Sandoval.

Mr. Sandoval then made a statement, and the judge thanked him.

[¶ 26] In the context of Rule 32(c) and the constitutional right of allocution, we have stated that "[a] defendant's right of allocution is not violated when he has been given an 'adequate opportunity under the circumstances to speak on his own behalf.'" *Wilson*, ¶ 15, 155 P.3d at 1012, quoting *U.S. v. Muniz*, 1 F.3d 1018, 1025 (10th Cir.1993). Here, under the circumstances where defense counsel asked if the defendant could make a statement and the court responded in the affirmative and greeted the defendant, the district court complied with its responsibility to personally address the defendant. *Compare, U.S. v. Benitez–Diaz*, 320 Fed.Appx. 868, 874 (10th Cir.(Kan.) 2009) (unpublished opinion holding the defendant's right of allocution was violated when the sentencing court only addressed him to ask if he agreed with the proposed sentence and he did not make a statement on his own behalf). Mr. Sandoval points to no authority indicating that specific words must be uttered by the court in order to fulfill its obligation. Moreover, given that Mr. Sandoval presented a statement on his own behalf and he does not describe, on appeal, the additional information he would have presented to the district court had he been asked in a different manner, we conclude he was provided a sufficient opportunity to allocute.

[¶ 27] Mr. Sandoval also argues on appeal that in order for his right of allocution to be meaningful he should have been afforded the right to speak after the prosecutor's remarks. In this case, the child's mother and grandmother spoke and then the prosecutor stated that he did not have any other witnesses at that time and defense counsel wished to go next. Mr. Sandoval's defense attorney and family members spoke on his behalf and he gave a brief statement apologizing for his actions and asking for leniency. Defense counsel then stated that he was finished for the time being and indicated the prosecutor may have some comments to make, after which he might respond. The State presented the evidence and argument in support of its request for a lengthy sentence. Defense counsel responded to the State's argument and again asked that Mr. Sandoval be treated leniently. After defense counsel's response, the court asked if there was "anything else on behalf of the State or the defense." Neither party offered additional information or argument pertaining to sentencing.

[¶ 28] Rule 32(c) does not state that the defendant, himself, will be provided with the last opportunity to speak before the judge passes sentence. It only states that he will be provided the opportunity to present a statement and information in mitigation of the sentence and that the State will have an equivalent opportunity to speak to the court. Here, the defendant was given the opportunity to present evidence in mitigation of punishment and a statement on his own behalf. His attorney had the last word before the court announced its sentence and the defense declined the district court's invitation to offer additional comments. As such, Mr. Sandoval was provided a sufficient opportunity of allocation and has, therefore, failed to establish plain error.

## CONCLUSION

[¶ 29] Mr. Sandoval received a fair sentencing hearing. The vast majority of the prosecutor's argument was acceptable and based upon the evidence; consequently, Mr. Sandoval failed to show a violation of a clear and unequivocal error of law to establish plain error. Mr. Sandoval also made no showing of plain error to justify reversal as a result of the one improper statement about the "chuckling incident" because he did not

establish that he was prejudiced by the error. Finally, because Mr. Sandoval was given an adequate opportunity to allocute on his own behalf, he cannot establish plain error in that regard.

[¶ 30]   Affirmed.